## IN THE SUPREME COURT OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| JENNIFER PAVIK, DOUGLAS TODD PAVIK, and ASHLEE JEAN REED, | § § § § § | No. 160, 2017 |
| | § | Court Below: Superior Court |
| Plaintiffs Below, Appellants, | § § | of the State of Delaware |
| | § | C.A. No. S14C-01-006 |
| v. | § | C.A. No. S14C-04-005 |
| | § | Consolidated |
| GEORGE & LYNCH, INC., a Delaware corporation, and GEORGE & LYNCH TRUCKING, LLC, a Delaware Limited Liability Company, | § § § § § | |
| Defendants Below, Appellees. | § § | |

Submitted: January 10, 2018
Decided: March 23, 2018

Before **STRINE**, Chief Justice; **VALIHURA**, **VAUGHN**, **SEITZ**, and **TRAYNOR**, Justices, constituting the Court *en Banc*.

Upon appeal from the Superior Court.    **REVERSED AND REMANDED**.

Chase T. Brockstedt, Esquire, (*argued*), Lewes, Delaware, Stephen A. Spence, Esquire, Lewes, Delaware, Vincent A. Bifferato, Jr., Esquire, Wilmington, Delaware, and Roger D. Landon, Wilmington, Delaware, for Appellants.

Louis J. Rizzo, Jr., Esquire, (*argued*), Wilmington, Delaware for Appellees.

**VAUGHN**, Justice, for the Majority:

## I.

This appeal involves a single-vehicle accident that occurred on Omar Road in Sussex County. Ashlee Reed was the driver of the vehicle, and Jacqueline Pavik was her passenger. Reed was injured in the accident. Pavik died from injuries she received. At the time, Omar Road was undergoing reconstruction. The accident occurred on a Sunday night when no construction was taking place and the road was open to the public. Reed and Pavik's parents allege that the accident was caused by an unsafe road condition known as raveling, which was a byproduct of the road reconstruction. Raveling, they claim, caused Reed to lose control of her vehicle and crash into trees off the roadway. George & Lynch, Inc. (George & Lynch) was the general contractor in charge of construction. Reed and Pavik's parents brought suit against a number of entities, but this appeal involves only George & Lynch. Among the claims they assert against George & Lynch is a claim that George & Lynch was negligent for failing to place adequate temporary traffic control signs or devices warning the public of road conditions. The Superior Court granted summary judgment in favor of George & Lynch, holding that it had no duty to post temporary traffic control signs or devices warning about the condition of the road on the weekend the accident occurred, regardless of whether it anticipated that

2

raveling would occur because of a predicted storm over the upcoming weekend. The Superior Court also held that certain repair work that the Delaware Department of Transportation (DelDOT) performed on Omar Road on the day of the accident broke any causal link between George & Lynch's alleged negligence and the accident. The question on appeal is whether the Superior Court's summary judgment analysis was legally correct. We have concluded that it was not and that the judgment of the Superior Court must be reversed.

## II.

The State of Delaware and DelDOT entered into a contract with George & Lynch to repave a number of roads in Sussex County, including Omar Road. It was agreed that a paving process known as cold in-place recycling (CIPR) would be used.[1] CIPR is a method of removing and reusing the existing surface. It involves removing roughly two to five inches off the top of the existing asphalt surface, mixing that crushed asphalt with a binding agent, and then reapplying it as a recycled base layer. Paving rollers then compact the reused asphalt into place. Finally, an overlay—either a sealant or a thin layer of fresh asphalt—is placed on top of the recycled material. The overlay process cannot take place until the recycled asphalt

---

[1] George & Lynch subcontracted the CIPR work to E.J. Brenneman. E.J. Brenneman settled with the Appellants and is not involved in this appeal.

has cured, which takes approximately one week. During this one-week curing period, the road surface is in an unfinished condition, but the road may be re-opened to traffic before the final coat is applied.

The contract between the State and George & Lynch included a section titled "Maintenance of Traffic." It provided, in pertinent part:

> This item shall consist of furnishing, installing, maintaining and/or relocating the necessary temporary traffic control devices used to maintain vehicular, bicycle and pedestrian traffic . . . . All work shall be performed in a manner that will provide reasonably safe passage with the least practicable obstruction to all users, including vehicular, bicycle and pedestrian traffic.

> All requirements of the Delaware Manual on Uniform Traffic Control Devices (MUTCD), Part 6, herein referred to as the Delaware MUTCD . . . shall apply for all temporary traffic control devices. Any, and all, control, direction, management and maintenance of traffic shall be performed in accordance with the requirements of the Delaware MUTCD, notes on the Plans, this specification, and as directed by the Engineer.

> The Contractor shall be aware that the Case Diagrams and safety measures outlined in the Delaware MUTCD are for common construction situations and modifications may be warranted based on the complexity of the job. The Contractor shall submit justification for modifications to the Temporary Traffic Control Plan (TTCP) to the Engineer for approval prior to implementation.

> . . . .

> . . . The Contractor shall submit a Temporary Traffic Control Plan (TTCP) . . . at or prior to the pre-construction meeting. . . .

4

. . . [T]he Contractor shall be required to have an American Traffic Safety Services Association (ATSSA) certified Traffic Control Supervisor on the project. The authorized designee must be assigned adequate authority, by the Contractor, to ensure compliance with the requirements of the Delaware MUTCD and provide remedial action when deemed necessary by the Traffic Safety Engineer or the District Safety Officer. The ATSSA certified Traffic Control Supervisor's sole responsibility shall be the maintenance of traffic throughout the project. This responsibility shall include, but is not limited to, the installation, operations, maintenance and service of temporary traffic control devices. Also required is the daily maintenance of a log to record maintenance of traffic activities, i.e., number and location of temporary traffic control devices; and times of installation, changes and repairs to temporary traffic control devices. The ATTSA [sic] Traffic Control Supervisor shall serve as the liaison with the Engineer concerning the Contractor's maintenance of traffic.[2]

Other parts of the contract addressed other matters, such as public safety and

traffic control:

**104.09 Maintaining Traffic.** . . . The Contractor shall keep the section of the Project being used by public traffic in a condition that safely and adequately accommodates traffic. The Contractor shall furnish, erect, and maintain barricades, drums, warning signs, delineators, striping, and flaggers, in accordance [with] the Traffic Control Manual.[3]

**104.14 Contractor's Responsibility for Work.** Until the Contractor has achieved substantial completion, the Contractor shall have the sole and absolute responsibility for the work and to provide for the protection and safety of . . . members of the general public.[4]

[Note] 7: All work shall be performed in a manner that will reasonably provide the least practicable obstruction to all road users,

---

[2] App. to Opening Br. A0222.
[3] *Id.* at A0279.
[4] *Id.* at A0282.

including vehicular, pedestrian and bicycle traffic, and shall conform to the requirements of the 2011 Delaware Manual on Uniform Traffic Control Devices, Part 6, including all revisions up to the date of advertisement for bids.[5]

Provisions pertinent to warning signs found in the Delaware Manual on Uniform Traffic Control Devices (DeMUTCD) include the following:

**Section 2C.01** . . . Warning signs call attention to unexpected conditions on or adjacent to a highway, street, or private roads open to public travel . . . that might call for a reduction of speed or an action in the interest of safety and efficient traffic operations.

**Section 2C.02** . . . 01 The use of warning signs shall be based on an engineering study or on engineering judgment.

*Guidance:*

02 *The use of warning signs should be kept to a minimum as the unnecessary use of warning signs tends to breed disrespect for all signs.*[6]

**Section 6A.01** . . . 07 No one set of [temporary traffic control (TTC)] devices can satisfy all conditions for a given project or incident. At the same time, defining details that would be adequate to cover all applications is not practical. Instead, Part 6 displays typical applications that depict common applications of TTC devices. The TTC selected for each situation depends on [the] type of highway, road user conditions, duration of operation, physical constraints, and the nearness of the work space or incident management activity to road users.[7]

**Section 6F.47** . . . Special warning signs may be used based on

---

[5] *Id.* at A0310.
[6] *Id.* at A0320.
[7] *Id.* at A0326.

engineering judgment. Guidance: Special warning signs should conform to the general requirements of color, shape, and alphabet size and series. The sign message should be brief, legible, and clear.[8]

The contract also contained provisions which discussed the relationship between DelDOT and George & Lynch:

**105.01 Authority of the Engineer.** The Engineer [i.e., DelDOT] is the administrator of the Contract and not a supervisor of the work. . . .

**105.02 Authority and Duties of Inspectors.** Inspectors, acting under the authority of the Engineer, are administrators of the Contract and not supervisors of the work. . . . The inspector shall in no case act as foreman or perform other duties for the Contractor, nor interfere with the management of the work by the latter.[9]

As required by the Maintenance of Traffic section of the contract, George & Lynch submitted a traffic control plan to DelDOT prior to the start of construction. The plan George & Lynch chose followed two "case diagrams" from the DeMUTCD: Case 6 and Case 15. Case 6 was supplemented by Figure 6C-1 and Table 6C-1. They provided for certain permanent warning signs, permanent in the sense that they were erected at the beginning of construction and remained in place until the project was completed. The permanent signs, placed at proper intervals, read "ROAD WORK 1500 FT," "ROAD WORK 1000 FT," "ROAD WORK 500 FT," and "END ROAD WORK," facing each direction and along every side street.

---

[8] *Id.* at A0337.
[9] *Id.* at A0283.

Case 6 also addressed the use of temporary warning signs for flaggers and for shutting down one lane of a two lane road while construction was actively occurring. These signs indicated that a flagger was present and that a lane was closed. Case 15 addressed creating a detour if both lanes of Omar Road needed to be shut down. Under the contract, roadwork was restricted to the hours of 8:00 a.m. to 4:00 p.m., Monday through Friday, which meant that the temporary signs relating to lane closures and flaggers were to be taken down at the end of each work day and "traffic [was to be] returned to unrestricted roadway use until work resumed the next weekday morning."[10] The plan did not require any temporary warning or traffic control signs at night or on weekends for any portion of the project, including areas where the CIPR asphalt was curing. The plan was approved by DelDOT.

The use of CIPR presents a risk that a condition known as "raveling" can occur when the rough CIPR recycled base layer is curing. When the base layer "ravels," it loses its integrity and starts to break apart. This causes the formation of loose gravel, depressions, potholes, and ruts. A deteriorated road surface with those conditions can result in vehicles losing control because it adversely affects the tire-to-road friction dynamic – the tires' grip is lessened which diminishes the driver's

---

[10] *Id.* at A0224.

control.

There is evidence that George & Lynch had prior experience with raveling while using CIPR. Raveling occurred during George & Lynch's CIPR paving jobs located on State Route 20 between Dagsboro and Roxana in 2008, and again on State Route 404 between Bridgeville and Georgetown in 2011. As part of a 2012 Sussex County repaving project that included Omar Road, George & Lynch experienced raveling of CIPR on Indian Mission Road a few months prior to the accident in this case.

There is also evidence that George & Lynch was aware from experience that a roadway that is undergoing the CIPR curing process is especially susceptible to raveling when it is subjected to heavy traffic, excessive rainfall and limited sunlight. George & Lynch employees testified by deposition that they were aware that Omar Road was heavily traveled, at least at that time of year, especially on weekends, because it is a primary route from inland Sussex County to the resort beaches. There is also evidence they were aware that the section of Omar Road where the accident occurred was heavily wooded with a significant tree canopy that limited sunlight.

On August 22 (four days before the accident), weather forecasts began predicting significant rainfall for the weekend. By Friday, August 24, recycled

9

asphalt had been laid on a portion of the road and compacted into place to begin the curing process. At 4:00 p.m., work was stopped for the weekend, and the road was reopened to traffic. At that time, the road surface appeared to be in order, and there was no evidence of raveling. DelDOT inspectors and safety inspectors were satisfied with the road's condition. As contemplated by the contract, George & Lynch removed the temporary lane closure and flagger signs when the road was reopened, leaving behind only the standard set of "Road Work" signs.

On Saturday, August 25, a severe thunderstorm passed through the area. By noon on Sunday, DelDOT had received complaints from drivers about potholes on Omar Road. These complaints suggest the thunderstorm may have disrupted the compacted asphalt material and interrupted the curing process. George & Lynch was under contract to make itself available during non-work hours to make repairs, but DelDOT was unable to locate its list of emergency contacts George & Lynch had provided. On the afternoon of Sunday, August 26, DelDOT sent its own crew out to patch potholes on Omar Road around 3:30 p.m.

On Sunday night, August 26, 2012, around 11:00 p.m., Reed and Pavik were driving from Ocean City, Maryland, to their homes in Sussex County. Reed was driving. Pavik was the front-seat passenger. Reed claims that while driving on Omar Road, she saw a deer just off the side of the road in the grass, facing toward

10

the road.    The deer startled her, and she worried it would dash into the road.    She reacted by applying her brakes.    She then started to feel gravel under her tires for the first time.    Upon pressing her brakes, the back end of the vehicle started to "swish."    Due to the loss of friction between the vehicle's tires and the road surface, the vehicle lost directional control and entered a yaw.    In a yaw, a vehicle's tires are rolling but sliding sideways.    She tried to recover by turning the opposite way and adding more pressure to her brakes.    Her actions, however, did not restore control.    The vehicle left the roadway and struck trees before coming to rest.

The accident occurred on the portion of Omar Road that was undergoing the curing process.    The road had deteriorated due to raveling.    Corporal Jay Burns of the State Police Collision Reconstruction Unit reported that the "area that was re-surfaced appeared to be extremely rough and deteriorating creating an unstable driving surface"[11] and that he had observed "large depressions and scattered gravel."[12]

Reed testified in her deposition that if she had known that loose gravel was present on the road or that the road was rough, she would have reduced her speed until she had been able to gauge the road's condition.

---

[11]  *Id.* at A0522.
[12]  *Id.* at A0524.

11

The Appellants' collision reconstruction expert, John Nawn, testified in his deposition that the raveling on Omar Road caused Reed's vehicle to lose control. He also testified that temporary warning signs should have been in place that warned motorists that the surface conditions of the pavement were not the surface conditions of a normally paved roadway, signs such as "Rough Road" and "Loose Gravel" or "Uneven Pavement." George & Lynch disputes Nawn's opinions. It argues that "[a]lthough John Nawn has stated that he would have put up a warning sign, at no time in his deposition nor in his report could he site [sic] to a specific provision in the DeMUTCD that required such a sign. Nawn could only state with certainty that a sign would have been 'consistent' with the DeMUTCD." However, in a supplemental report dated February 25, 2016, Nawn states that "George & Lynch's failure to provide warning sign(s) breached the standard of care under the terms of their contract with the Delaware Department of Transportation and the provisions of the Manual on Uniform Traffic Control Devices."[13]

DelDOT's construction-area supervisor conducted a post-accident investigation and concluded that all required signs were in place at the time of the accident and there was no deviation from the DeMUTCD.

---

[13] The Superior Court did not make any rulings regarding the expert's testimony.

In its motion for summary judgment, George & Lynch argued that it did not owe a legal duty to the plaintiffs to erect temporary warning signs. The plaintiffs argued that the permanent warning signs were insufficient to alert Ms. Reed to the perils of traveling on Omar Road as it underwent the CIPR curing process and that temporary warning signs such as "Loose Gravel" or "Rough Road" should have been in place.

The Superior Court granted summary judgment in favor of George & Lynch. In the court's view, the first element of the negligence inquiry—duty—was dispositive of George & Lynch's liability.[14] The court held that the traffic plan in George & Lynch's contract with the State defined the scope of its duty, and because the plan did not call for the use of a "Loose Gravel" or "Rough Road" sign when a road was open to traffic during non-construction hours, George & Lynch had no duty to erect one.[15] It also ruled that DelDOT's repair work over the weekend "broke

---

[14] *See Pavik v. George & Lynch, Inc.*, 2016 WL 5335792, at *3 (Del. Super. Ct. Sept. 22, 2016) ("Liability depends upon whether the defendant was 'under a legal obligation—a duty—to protect the plaintiff from the risk of harm which caused his injuries.' . . . Whether a duty exists is a question of law to be determined by the trial court. The heart of this litigation concerns George & Lynch's legal duty, if any, to erect additional temporary warning signs . . . .").

[15] *Id.* at *3–4 ("George & Lynch contends it was not negligent because its [movement of traffic] plan was DelDOT-approved and prepared in accordance with the DMUTCD standards. The Court concurs with George & Lynch. . . . '[George & Lynch] was following an approved plan. No negligence can follow in such a situation merely because there might have been another way to control traffic.' . . . In sum, George & Lynch was not negligent for following a DelDOT-approved temporary traffic control plan encompassing the use of advance permanent ['Road Construction'] warning signs and temporary warning signs while work was in progress." (second alteration in

13

any causation link" between George & Lynch's work and the accident.[16]

## III.

"This Court reviews *de novo* the Superior Court's grant or denial of summary judgment 'to determine whether, viewing the facts in the light most favorable to the nonmoving party, the moving party has demonstrated that there are no material issues of fact in dispute and that the moving party is entitled to judgment as a matter of law.'"[17]

## IV.

The appellants contend that summary judgment was inappropriate because genuine issues of material fact remain regarding whether George & Lynch breached its duty of care to the traveling public to act as a prudent and reasonable contractor in performing the work on Omar Road. They contend that George & Lynch was responsible for in-the-field maintenance of traffic conditions – including the use of temporary warning signs; that George & Lynch had a duty to exercise its judgment to determine whether temporary warning signs should have been used to warn motorists of the risks that might be encountered while driving on the unfinished

---

original)).

[16] *Id.* at *5.

[17] *Brown v. United Water Del., Inc.*, 3 A.3d 272, 275 (Del. 2010) (quoting *Estate of Rae v. Murphy*, 956 A.2d 1266, 1269–70 (Del. 2008)).

14

portions of Omar Road; and that George & Lynch breached that duty by failing to erect warning signs.

George & Lynch contends that it was under no duty to place temporary warning signs along the road the Friday afternoon before the accident; that neither the Appellants nor their expert could identify any requirement by DelDOT or the DeMUTCD that a sign must be erected warning motorists that they will be driving on a temporary roadway; that neither the appellants nor their expert could identify any specific conditions of the roadway that existed on Friday night that would have required the use of a warning sign; that no duty exists to place warning signs for a condition which has not yet but, might develop; and that the grant of summary judgment was appropriate.

## V.

The parties' call our attention to four Delaware cases that have discussed accidents at road construction sites. The first in time is a decision of this Court, *High v. State Highway Dep't.*[18]

In *High*, the plaintiff's husband was killed in an accident at a road construction site. Road construction was taking place on the southbound lanes of a dual

---

[18] 307 A.2d 799 (Del. 1973).

15

highway. Traffic was diverted from the southbound lanes over a grass median, and detoured onto the northbound lanes which had been temporarily altered to handle both directions of traffic. The altered northbound lanes had a double-yellow line to separate the traffic. The plaintiff's husband was struck when a motorist crossed over into the opposite traffic lane while braking to avoid a sudden traffic stoppage ahead of him.

Prior to beginning the work, the general contractor was required to present a traffic control plan. The plan was approved by the Highway Department with several revisions. The plan provided for "a series of detour signs and barricades erected at each end of the detour; the painting of double yellow lines . . . 'do not pass' signs . . . and the placement of 'advisory' speed signs."[19] The plaintiff sued the Highway Department and the general contractor, alleging negligence on the part of both. All of the experts in the case, both for the plaintiff and the defendants, agreed the detour plan approved by the State was in accordance with nationally accepted standards and followed the Manual of Uniform Traffic Control Devices. The plaintiff's expert, however, testified that the Highway Department and the general contractor were negligent in not adopting a more cautious plan, including

---

[19] *Id.* at 803.

16

additional barricades and different signage.

This Court was of the view that since both the plan approved by the Highway Department and the plan proposed by the plaintiff's expert were in compliance with the Manual of Uniform Traffic Control Devices, it was not negligence to pursue one rather than the other. The Court stated: "[I]f there are two acceptable courses of action for the achievement of the same purpose, it is not negligence on the part of a defendant to pursue one rather than the other." The Court also found that there was no evidence that the plan was not "exactly followed" by the contractor.

For these reasons, the Court reversed a jury verdict against the Highway Department and the general contractor.

The other three cases are Superior Court cases. In the first of these, *Thurmon v. Kaplin*, a motorcyclist brought an action for personal injuries against a general contractor and sub-contractor for injuries he suffered from a motor vehicle accident that occurred during non-construction hours on a road undergoing repaving.[20] The motorcyclist was traveling in the right turn lane and was hit when another driver in the right thru-lane attempted to make a right turn across his lane. Some lane striping had been applied, but the right thru-lane and right turn-lane were not marked.

---

[20] 1999 WL 1611327 (Del. Super. Mar. 25, 1999).

The motorcyclist alleged the contractor and subcontractor were negligent in their traffic maintenance operations, in failing to provide temporary striping on the roadway, and for not closing the right turn-lane.

The record of that case showed that DelDOT's consulting engineer was ultimately responsible for determining when striping would be applied, and that at no time did he instruct the general contractor to apply striping indicating the boundaries of the right-turn lane. The plaintiff contended that the defendants had an independent duty to provide striping and turn-lane markings pursuant to the Manual on Uniform Traffic Control Devices. The Court rejected this contention because the Manual on Uniform Traffic Control Devices did not contain any specific provision that would make failure to provide striping and markings a violation of a mandatory duty. The Court also held, however, that the general contractor had assumed the responsibility of providing services necessary for the protection of the traveling public. Whether the general contractor had acted as a reasonable, prudent contractor in carrying out that duty, the Court reasoned, was a question for the jury.[21]

Next, in *Hales v. English*, a contractor was resurfacing a portion of Route 113,

_____

[21] The Court included a footnote that read as follows: "It could be that Tilcon is entitled to rely on DelDOT's discretionary decisions pursuant to *High v. State Highway Dep't.*. . . The record here, however, is incomplete as to what, if any, planning decisions were made regarding traffic flow during non-construction hours." *Id.* at *3 n.6.

18

a dual highway, pursuant to a contract it had with DelDOT.[22] The contractor prepared a traffic control plan in accordance with the DeMUTCD, which DelDOT approved. The plan called for hiring a police officer to direct traffic at an intersection. The plaintiffs were in a vehicle stopped at a stop sign at a side road, waiting to proceed across the southbound lane and turn left onto the northbound lane. The police officer was stationed at the intersection, as called for by the plan, directing traffic. The officer motioned for the plaintiffs' vehicle to move across the southbound lane. The plaintiffs believed the officer was motioning for them to move across the southbound lane and also continue on to make their left turn onto the northbound lane without stopping in the median to observe northbound traffic. A collision resulted. The plaintiffs argued the contractor should have closed the median, rerouted traffic in a different manner, or used an additional flagger.

The Superior Court relied on *High* in granting summary judgment for the contractor. It found no evidence that the contractor "deviated in practice from its approved traffic control plan."[23] The Court viewed the plaintiffs' argument as essentially the same argument that had been made in *High*, and quoted *High's* statement that "if there are two acceptable courses of action for the achievement of

---

[22] 2014 WL 12059005 (Del. Super. Aug. 6, 2014).
[23] *Id.* at *2.

19

the same purpose, it is not negligence on the part of a defendant to pursue one rather than the other."[24]

Finally, in *Patton v. 24/7 Cable Company, LLC*, a motorcyclist brought an action against a general contractor, various subcontractors, and another driver for injuries that resulted from a motor vehicle collision in an area that was under construction.[25] The defendant driver was driving in the northbound lane of Route 13 when he entered a crossover median to enter a parking lot on the southbound side. The crossover median was in a construction zone, and construction equipment was present in the crossover. The driver failed to see an oncoming motorcyclist and struck him. The motorcyclist alleged the contractors were liable because they failed to take reasonable safety precautions in the work zone, failed to warn of the danger they created, failed to protect the traveling public, and failed to comply with their DelDOT construction permit.

All the contractors moved for summary judgment, arguing no evidence existed that they breached any duty of care owed to the motorcyclist. Specifically, they argued they were not negligent as a matter of law because they properly designed and executed a traffic control plan in accordance with the DeMUTCD.

---

[24] *Id.* (citing *High*, 307 A.2d at 804).
[25] 2016 WL 6272552 (Del. Super. Aug. 31, 2016).

The Court reasoned that, to the extent the plaintiff alleged that the defendants were negligent in failing to maintain safe travel of the roadways through the construction site by not imposing additional safeguards, as in *High* and *Hales*, the standard of care was set forth by the DeMUTCD. To the extent, however, the plaintiffs were arguing that the defendants were negligent in failing to supervise the construction site, the Court reasoned that *High* and *Hales* were distinguishable and that the applicable standard of care was that of a reasonable and prudent contractor under the circumstances. Ultimately, the Court decided that a question of fact existed as to which DeMUTCD case plan applied, and whether the defendants actions were "in full compliance" with the DeMUTCD and the general contractor's contract with DelDOT.[26] Accordingly, summary judgment was denied.

There are significant differences between the facts in this case and the facts in *High*. In *High*, all of the experts in the case, both for the plaintiffs and the defendants, agreed that the traffic plan the contractor implemented—and the State approved—was in accordance with nationally-accepted standards and followed the DeMUTCD. In this case, by contrast, the Appellants' expert has expressed an opinion in his supplemental report that George & Lynch's failure to provide warning

---

[26] *Id.* at *4.

21

signs breached its contract with the State and the provisions of the DeMUTCD. In addition, this is not a case where the contractor is alleged to have been negligent by choosing between two acceptable traffic plans. Moreover, the Appellants here allege that George & Lynch failed to plan for a safety risk of which it was, or should have been, aware—raveling during the curing process. No such allegation was made in *High*. *Hales* followed the reasoning of *High*. *Thurmon* and *Patton* both recognized that a general contractor has a duty to act as a reasonable and prudent contractor in providing for the safety of the traveling public, which, as in *High*, a contractor may be able to discharge by implementing a traffic plan that is designed to mitigate those safety risks and that conforms to nationally-accepted standards like the DeMUTCD.

The Superior Court in this case appears to have understood *High* to stand for the principle that when the State approves a contractor's traffic management plan, the plan defines the scope of the contractor's duty, and as long as the contractor does not deviate from the plan, there can be no negligence. Under that line of reasoning, the Superior Court concluded that George & Lynch had no duty to erect any "Loose Gravel" or "Rough Road" signs because the traffic management plan in the contract did not call for them. The Superior Court erred in both its interpretation of *High* and its understanding of the traffic management plan in this case.

22

The Court's first error was to characterize *High* as a case about duty, rather than negligence. By framing this case as one that turned on the scope of George & Lynch's duty to Reed and other motorists, the Court took for itself the inherently fact-bound question of whether George & Lynch should have provided additional temporary warning signs about potential road conditions.[27]

*High*, however, turned on the element of breach, not duty. *High* absolved both the State and the contractor of liability in that case not because neither had a duty to take precautions to warn motorists about the construction, but because the precautions they incorporated into their traffic plan were reasonable under the circumstances. Because the traffic plan the State and the contractor had devised for the project "accord[ed] with the Uniform Manual on which highway engineers almost uniformly rely," the Court deemed it to have been an "acceptable" approach under the circumstances.[28] Having concluded that the plan was a reasonable one, the contractor could not be negligent for following it. That line of reasoning does not, however, suggest that, as a general matter, a road contractor's duty is circumscribed by the terms of a traffic plan incorporated into its contract with the

---

[27] *See Pavik*, 2016 WL 5335792, at *3 ("'[I]n appropriate situations, a trial court is authorized to grant judgment as a matter of law because no duty exists.' Whether a duty exists is a question of law to be determined by the trial court.").

[28] 307 A.2d at 804.

23

State, or that the trial courts should be determining the reasonableness of traffic management plans for construction zones as a matter of law. *High* simply stands for the proposition that if, as a factual matter, there is no dispute that a traffic plan was put in place to mitigate the sort of risks that led to an accident and that plan was in accord with nationally-recognized safety standards, the contractor does not breach its duty of care by following it.[29]

The second and more fundamental error in the Superior Court's reasoning was its conclusion that George & Lynch could not be liable for failing to use road surface warning signs like "Loose Gravel" or "Rough Road" because the traffic plan incorporated into the contract did not specifically call for them. But there is another key difference between this case and *High*. In *High*, all of the precautions the plaintiff believed that the contractor should have taken directly conflicted with the safeguards incorporated into the traffic plan that the State and the contractor had

---

[29] Further support for the notion that *High* turned on the element of breach (or a lack thereof), rather than on the scope of a contractor's duty, comes from the fact that the two authorities that *High* relied upon voiced their holdings in terms of whether a jury could find, as a matter of fact, that the defendant in each case had breached its duty of care. *See Di Filippo v. Preston*, 173 A.2d 333, 337 (Del. 1961) (concluding that "the plaintiffs failed to make a submissible issue of negligence for the jury and that, consequently, . . . the direction of a verdict for the defendant was proper"); *Boston, Cape Cod & N.Y. Canal Co. v. Seaboard Transp. Co.*, 270 F. 525, 529– 30 (1st Cir. 1921) ("'Negligence is the failure to do what a reasonable and prudent person would ordinarily have done under the circumstances of the situation, or doing what such a person under the existing circumstances would not have done.' . . . We find that the fair preponderance of the evidence on that question is in favor of the [defendant].").

24

adopted: the plaintiff contended that there should have been guardrails in place to separate the traffic rather than the mere double-yellow striping called for by the plan, there should have been a greater number of signs warning motorists about the change in traffic patterns than the number of signs that the MUTCD specified, and there should have been a swing-around area and a sign warning of an intersection ahead despite the fact that the plan did not call for either. Those precautions all would have gone above and beyond the traffic management plan that both sides conceded was already in accordance with national safety standards, so the contractor's failure to implement them could not have been a breach of its duty.

But in this case, erecting temporary warning signs during off-hours was not specifically addressed, one way or the other, by the plan. That is because the two case diagrams that George & Lynch specified from the DeMUTCD—Case 6 and Case 15—dealt only with the mitigation of risks to traffic while construction was active, when one or both lanes needed to be closed while repaving was actively taking place. Those two cases—which specified the signage to use to warn drivers of alterations to the normal traffic pattern—were not designed to mitigate risks that may arise during non-work hours, and they therefore have nothing to say about any steps George & Lynch might have needed to take to ensure safe passage during off-hours, when the lane closures were lifted and traffic was allowed to return to normal.

25

The fact that George & Lynch followed DeMUTCD-approved safety standards during working hours, in other words, does not mean that it acted reasonably to address risks that may have been posed to drivers during off-hours.In the absence of a specific (and reasonable) plan to deal with those risks, the scope of George & Lynch's obligations falls back on its general contractual duty to ensure that its work "conform[s] to the requirements of the 2011 [DeMUTCD]"[30]—which contemplates the use of road surface warning signs in appropriate circumstances—and its general tort duty to use reasonable care in carrying out its work.[31]

*High* does not stand for the proposition that a contractor's duty begins and ends with a traffic management plan—any traffic management plan—that is approved in advance by the State. *High* stands only for the more basic proposition that if a contractor follows a traffic management plan that addresses the risks that contributed to an injury in a way that accords with national safety standards, the contractor acts reasonably under the circumstances.

---

[30] App. A0310.

[31] *See, e.g.*, *Richardson v. Pioneer Const. Co.*, 434 P.2d 403 (Colo. 1967) (reversing a directed verdict against a plaintiff in a wrongful death suit arising out of an accident that occurred when a vehicle struck a patch of loose gravel and sand while driving through a construction zone during off-hours that was marked only with a standard road-work sign); Morgan Seeley, Annotation, *Highway Construction Contractor's Liability for Injuries to Third Persons by Materials or Debris on Highway During Course of Construction or Repair*, 3 A.L.R.4th 770, § 6 (1981) (collecting cases involving accidents that occurred on roads open during non-construction hours).

26

A contractor doing road construction has a common law duty to act as a reasonable and prudent contractor in providing for the safety of the traveling public.[32]   The record before us shows that George & Lynch also assumed that duty contractually.   The contract provided that "[a]ll work shall be performed in a manner that will provide reasonably safe passage . . ."; "[t]he Contractor shall keep the section of the Project being used by public traffic in a condition that safely and adequately accommodates traffic"; and "the Contractor shall have the sole and absolute responsibility for the work and to provide for the protection and safety of . . . members of the general public."   While DelDOT was ultimately responsible for oversight of the Project, the contract documents delegated to George & Lynch responsibility for maintenance of traffic and providing for the protection and safety of members of the public.

In the trial court's—and the dissent's—view, the fact that the contract "did not require George & Lynch to . . . set up additional anticipatory warning signs" to warn motorists about risks they might face during non-work hours meant that protecting motorists from foreseeable after-hours risks was outside of the scope of George & Lynch's undertaking as a contractor. [33] But the contract did not

---

[32] *Thurmon v. Kaplin*, 1999 WL 1611327, at *3 (Del. Super. Mar. 25, 1999); *see supra* note 31.
[33] *Infra* at 37.

27

affirmatively disclaim George & Lynch's duty to take reasonable care to mitigate the risks of its work to after-hours drivers. The contract was simply silent about what George & Lynch would need to do if it were to foresee, while it was on the job, a risk that might materialize overnight (or into the weekend).

Had the contract spelled out that George & Lynch's only undertaking was to perform road construction between 8:00 a.m. and 4:00 p.m. and disclaimed any responsibility on its part for the risks its work might pose outside of those hours, then perhaps it would have been exclusively the State's burden to mitigate whatever risks George & Lynch left behind at 4:00 p.m. each day (despite being in a worse position than George & Lynch to foresee them). But this contract did not go that far, and it is not for us to rewrite the parties' contract to change the allocation of a set of risks that the parties left unaddressed.

The Superior Court should have approached this case through the standard negligence framework: it should have determined whether George & Lynch should have, in the exercise of reasonable care, foreseen a need for temporary traffic control signs over the August 25-26 weekend, and if so, whether it should have sought authority from DelDOT to erect temporary traffic warning signs, whether DelDOT would have approved such a request, and whether the absence of warning signs was a cause of the accident.

28

George & Lynch argues that the DeMUTCD contains no specific requirements about placing signs on a temporary road surface. While that is true, the DeMUTCD does provide for the use of warning signs when road conditions warrant their use, and the fact that the DeMUTCD does not specifically enumerate the circumstances when they are needed to reasonably mitigate a safety risk does not mean they never are. It also argues that it did not violate the contract or the DeMUTCD. However, questions remain on such issues as to whether it satisfied its contractual obligation to provide for the protection and safety of the public. It also argues that warning signs should be used only when necessary and should be kept to a minimum. But whether the benefit to be gained from employing a specific precaution outweighs its costs is part of the inquiry into breach that is addressed to the finder of fact.[34] It also argues that the Appellants' expert did not provide a valid opinion that the DeMUTCD or contract was violated. While we express no opinion on the weight to be given the expert's testimony, he expresses an opinion in his supplemental report that George & Lynch breached its duty of care. Finally, George & Lynch argues that no duty exists to erect signs to warn of conditions that might develop, but have not yet developed. However, there is a duty to exercise

---

[34] *See United States v. Carroll Towing Co.*, 159 F.2d 169, 173 (2d Cir. 1947) (L. Hand, J.).

29

reasonable care with respect to risks that are foreseeable.[35]

## VI.

The Superior Court also ruled that DelDOT's weekend pothole patching "broke any causation link" between George & Lynch's conduct and the accident. The Superior Court's ruling on this issue consists of two conclusory sentences. We believe that questions of fact remain as to whether the DelDOT crew's activities Sunday afternoon contributed to the accident. The evidence is that the DelDOT crew was sent to repair potholes. Reed, however, did not recall hitting any potholes. There is evidence that Reed lost control on an area of Omar Road where there were no potholes and no potholes had been repaired. There is evidence that Reed lost control because of gravel and other rough road conditions. While there is clearly evidence that the road was deteriorated when Corporal Burns arrived at the scene after the accident, no evidence has been brought to our attention concerning the condition of the road when the DelDOT crew completed its work on Sunday afternoon.

George & Lynch argues that because DelDOT assumed control over the

---

[35] George & Lynch argues that it would be unreasonable to expect it to have "Loose Gravel" signs in place when there was no loose gravel when it left the work site on Friday afternoon. We understand that argument. The relevance of "Loose Gravel" signs would depend upon the foreseeability of raveling and loose gravel that occurred on the weekend.

roadway on Sunday afternoon, made repairs, and reopened the road to the general public without additional warning signs, any causal link to the conduct of George & Lynch was broken. Under the specifications, however, DelDOT's role for after-hours work is limited to "making repairs" in case of an emergency if it could not reach George & Lynch.[36] Any duties the DelDOT crew may have had beyond repairing potholes are unclear on this record. The extent to which the crew inspected parts of the road where no potholes were observed, the extent to which the raveling at the site of the accident had manifested itself while the crew was there, whether the particular crew involved had experience with raveling on CIPR road surfaces, and whether the crew had any responsibility for signs are questions that would seem to be relevant to the issue of DelDOT's conduct as a superseding cause, but that have gone unaddressed. "[T]he question of superseding cause is fact-driven."[37] On this record, it was error to rule that DelDOT's conduct on Sunday afternoon was a superseding cause as a matter of law.

## VII.

The dissent expresses a concern about the case being decided on emotion.[38]

---

[36] B0010.

[37] *Duphily v. Del. Elec. Co-op, Inc.*, 662 A.2d 821, 830 (Del. 1995).

[38] *Infra* at 42 ("In any case where a young life is lost, human heartstrings are naturally pulled, including those of juries, and there is a temptation to award compensation even if no party is at fault, especially if the party being sued is perceived as having large resources.").

31

The dissent's concern seems to reflect a lack of confidence in trial by jury that we do not share. Superior Court juries, under the careful guidance of Superior Court judges, regularly carry out their duties in emotional cases without allowing sympathy to affect their verdicts. We are confident the same can be done in this case.

The dissent also discusses the duties of a Delaware driver and Ms. Reed's compliance with those duties.[39] However, the issue of Ms. Reed's alleged negligence is a question for the jury, not this Court, and has no bearing on George & Lynch's motion for summary judgment. The dissent's detours into issues of breach and comparative negligence all present fact-bound inquires within the province of the jury. The dissent also expresses a concern about increased cost of road improvement contracts, but we are satisfied that any such concern can be addressed through appropriate drafting of road improvement contracts.[40]

It is important to remember the scope of this appeal. The trial court absolved George & Lynch of liability at duty, the very first step of the negligence inquiry, and

---

[39] *Infra* at 42-45. *Infra* at 44 ("[T]he four prominent warning signs that were posted in full compliance with the approved plan . . . should signal to any reasonable driver the need to slow down . . . ."). *Infra* at 45 ("[D]espite the reality that there were four prominent signs on Omar Road warning of the construction, the driver also testified that she did not see any indicates of construction, including road work signs, and did not reduce her speed until she braked when she spotted a deer on the side of the road.").

[40] *Infra* at 40 "Not only does the contract make clear that George & Lynch does not have authority or responsibility to do this, but we also risk imposing increasing costs on the state and its taxpayers in the procurement process for road improvement projects."

we venture no further than to hold that that was error—and to observe that genuine disputes of fact remain about whether the repairs that DelDOT performed "broke any causation link" between George & Lynch's work and the accident, to the extent the Superior Court relied upon that conclusion as an independent basis to grant summary judgment in George & Lynch's favor. Even with George & Lynch's duty established, the plaintiffs still have to prove the other negligence elements.

## VIII.

The judgment of the Superior Court is reversed and the case is remanded for further proceedings consistent with this opinion.

**STRINE**, Chief Justice, dissenting, with **SEITZ**, Justice, joining.

We respectfully dissent from the well-stated decision of the majority reversing the Superior Court's grant of summary judgment to George & Lynch. In its decision, the Superior Court relied on this Court's decision in *High v. State Highway Department*, which it correctly read as precluding the imposition of tort liability on a DelDOT contractor that complies with the contractually specified and DelDOT-approved traffic control plan.[41]

Applying *High*, the Superior Court held that the approved plan limited George & Lynch's obligations because there is no evidence that George & Lynch deviated from the plan. Absent such evidence, "[n]o negligence can follow . . . merely because there might have been another way to control the traffic."[42] That is, "if there are two acceptable courses of action for the achievement of the same purpose, it is not negligence on the part of a defendant to pursue one rather than the other."[43]

Consistent with George & Lynch's contractual limitations, on the afternoon of Friday, August 24th, 2012, DelDOT took charge of Omar Road, at that time a nonactive work zone that did not require additional anticipatory warning signs, and

---

[41] *High v. State Highway Dep't*, 307 A.2d 799 (Del. 1973).

[42] *Pavik v. George & Lynch*, C.A. No. S14C-01-006, 2016 WL 5335792, at *3 (Del. Super. Sept. 22, 2016).

[43] *Id.* (citing *Hales v. English*, 2014 WL 12059005, at *2 (Del. Super. Aug. 6, 2014), *aff'd sub nom.*, *Hales v. Pennsy Supply Co.*, 2015 WL 2330065 (Del. 2015)).

approved it to be reopened to its normal flow of traffic.[44]    And on that Sunday, after

a heavy rainstorm, in response to complaints about the condition of the road,

DelDOT had its own crews repair the road, instead of requesting that George &

Lynch make the repairs.[45]    George & Lynch owed a duty to perform repairs outside

of its scheduled work hours only if DelDOT asked it to do so, and DelDOT never

made that request.[46]    Instead, as the Superior Court found, DelDOT failed to give

George & Lynch notice of the potholes that developed on Omar Road after the

weekend rainstorm, and took affirmative action to repair the road itself.[47]    Nor did

DelDOT give George & Lynch any notice that raveling was occurring on the road;

nor did it take any action to put up additional warning signs.

Not only did George & Lynch have no duty to perform any inspection or

maintenance over the weekend, but as the Superior Court held, DelDOT's decision

to not ask George & Lynch to repair the road, and instead repair the road itself, broke

any causal link between the work George & Lynch finished on that Friday afternoon

and the tragic accident at 11:00 PM on that Sunday night.[48]

Because George & Lynch conformed to its duty under the approved traffic

---

[44]  *Id.* at *4.
[45]  *Id.* at *4–5.
[46]  *Id.*
[47]  *Id.* at *5.
[48]  *Id.* at *2, 5.

control plan, and DelDOT's assumption of control of the road at 4:00 PM on that Friday afternoon and repair of it that Sunday afternoon broke any causal connection between George & Lynch's work and the accident at 11:00 PM that Sunday night by not activating George & Lynch's obligation to make after-hours repairs, we would affirm the Superior Court's grant of summary judgment.

## I.

George & Lynch's contract with DelDOT, which defined the scope of its duty, did not give George & Lynch general control of the road, but rather, required it to adhere to certain specified obligations, which defined its potential for liability.[49] These contractual obligations included: setting up four permanent warning signs stating "ROAD WORK 1500 FT," "ROAD WORK 1000 FT," "ROAD WORK 500 FT," and "END ROAD WORK";[50] only working Monday through Friday between 8:00 AM and 4:00 PM;[51] modifying the flow of traffic during active construction as

---

[49] *Id.* (citing *Brown v. F.W. Baird, LLC*, 2008 WL 324661, at *2–3 (Del. 2008) ("In Delaware, it is the scope of the undertaking as defined in the contract, which gives shape to the independent contractor's duty in tort."); *id.* at *1 (the contract required George & Lynch to conform to "(1) DelDOT's standard specifications dated August 2001 and as amended by the supplemental specifications, (2) the contract's special provisions, (3) the most recent standard construction details, (4) the Delaware Manual on Uniform Traffic Control Devices . . . and (5) the contract plans and specifications").

[50] *Id.* at *1.

[51] App. to Appellant's Opening Br. at A313 (Plan and Specifications for Contract No. T201206304 [hereinafter Plan and Specifications]). The majority relies on a footnote of the Superior Court's decision in *Thurmon v. Kaplin* for the proposition that whether a general contractor has acted as a reasonable, prudent contractor in carrying out its assumed responsibility

described by the approved plan;[52] filling all ruts and potholes at the end of each workday; and, after DelDOT inspection, returning traffic to its original unrestricted flow and removing temporary warning signs indicating the presence of a flagger and a lane closure.[53]

The contract did not require George & Lynch to, in its own discretion, set up additional anticipatory warning signs during nonactive construction for nonexistent conditions that may arise between the end of its workday on Friday at 4:00 PM and the start of its next scheduled workday on Monday at 8:00 AM. To do so would be contrary to the Delaware Manual on Uniform Traffic Control Devices, which advises that "[t]he use of warning signs . . . be kept to a minimum" and that "where the condition or activity is seasonal or temporary, the warning sign should be removed

---

of providing services to protect the public is a question for the jury. 1999 WL 1611327 (Del. Super. Mar. 25, 1999). The full text of this footnote highlights a critical distinction between the Superior Court's decision that the contractor in that case assumed a common law duty of care and the facts before this Court: "It could be that Tilcon is entitled to rely on DelDOT's discretionary decisions pursuant to *High v. State Highway Dep't*, Del. Supr., 307 A.2d 799, 803-804 (1973) (holding that if the detour, warning signs and other safeguards were erected in accordance with the plan approved by the Highway Department, there is, as a matter of law, no proof of negligence on the part of the contractor). *The record here, however, is incomplete as to what, if any, planning decisions were made regarding traffic flow during non-construction hours.*" *Id.* at *3 n.6 (emphasis added). In this case, the record is clear that George & Lynch had no authority to erect additional anticipatory warning signs without DelDOT approval, and no duty to make any repairs outside of its specified work hours, except if asked to do so by DelDOT.

[52] App. to Appellant's Opening Br. at A313 (Plan and Specifications).

[53] *Id.* at A222 (Contract No. T201206304.01); *id.* at A309 (Plan and Specifications); *id.* at A317–19 (Preconstruction Meeting Minutes).

or covered when the condition or activity does not exist" so as to not "breed disrespect" for warning signs through unnecessary overuse.[54]    The contract also did not require George & Lynch to conduct weekend inspections or maintenance, unless asked to do so by DelDOT.[55]

On August 24, 2012, at the end of the day, George & Lynch complied with its contractual duties when it removed the temporary warning signs indicating the presence of a flagger and a lane closure; left in place the permanent warning signs that read "ROAD WORK 1500 FT," "ROAD WORK 1000 FT," "ROAD WORK 500 FT," and "END ROAD WORK"; and filled in all ruts and potholes.[56]    DelDOT inspected the road and, finding no problems with the surface of the road, reopened it to traffic.[57]    At the time George & Lynch stopped working on that Friday afternoon, it was not raining, and there was no raveling on Omar Road.[58]    Any driver approaching and driving on the road would have seen four prominent signs making it clear that Omar Road was undergoing road work and was not in its normal

---

[54]  *Id.* at A320 (Delaware MUTCD § 2C.02).
[55]  App to Appellee's Ans. Br. at B0010 (DelDOT Standard Specification Subsection 107.07 ("The Contractor shall maintain a safe work site at all times and be prepared to make repairs as needed after normal working hours in the case of an emergency.    If the Department is unable to contact the Contractor to make these repairs then the State Maintenance forces or a third party contractor may be used to make such repairs.")).
[56]  *Id.* at B38 (Deposition of Thomas Wayne Massey).
[57]  *Id.* at B41.
[58]  *Id.*

condition.

## II.

A heavy rainstorm struck the area of Omar Road on Saturday, and on Sunday morning, after receiving many complaints about the condition of Omar Road, DelDOT's maintenance crew confirmed the presence of potholes requiring immediate repair.[59]    On Sunday afternoon, DelDOT had its own crews make the repairs, instead of asking George & Lynch to do so.[60]    This broke any causal connection between George & Lynch's work up to that Friday afternoon, when the road was reopened with DelDOT approval, and the tragic accident that Sunday night, because during that time, DelDOT retained full control of the site, never authorized George & Lynch to make any repairs, and did not, in its judgment, undertake to set up any signs warning of the condition of the surface of the road (by reason of potholes or raveling) after making its repairs.[61]

## III.

We are reluctant to hold George & Lynch responsible for monitoring the road 24/7 and facing possible liability based on its failure to set up additional anticipatory

---

[59]  *Id.* at B4–7 (DelDOT Memorandum, Post Accident Investigation).

[60]  *Id.* at B112–13 (Plaintiff's Answers to Request for Admissions); *id.* at B4–7 (DelDOT Memorandum, Post Accident Investigation).

[61]  *Id.* at B4–7 (DelDOT Memorandum, Post Accident Investigation).

warning signs based on shifting weather conditions, nay forecasts. Not only does the contract make clear that George & Lynch does not have the authority or responsibility to do this, but we also risk imposing increasing costs on the state and its taxpayers in the procurement process for road improvement projects.

Here, there can be no argument that if any party was responsible for determining if additional signage warning of the condition of the surface of Omar Road should have been set up on the day of the accident, it was DelDOT. But, DelDOT did not waive its sovereign immunity protection for this project because it did not purchase any liability insurance that would cover an accident like this,[62] leaving only George & Lynch as a potentially responsible party. Nor did DelDOT craft a contract that required George & Lynch to conduct weekend inspections, consistently monitor and assess weather forecasts, and set up additional anticipatory warning signs for temporary and intermittent conditions. Instead of imposing such a contractual obligation and creating additional expense, DelDOT took control of the road and assumed for itself the responsibility of conducting after-hours inspections and repairs. The majority's imposition of an additional general tort duty of reasonable care to serve as a back-stop for weekend repairs ignores the fact

---

[62] *Pavik*, 2016 WL 5335792, at *6 (citing *Doe v. Cates*, 499 A.2d 1175, 1179 (Del. 1985) (waiver of sovereign immunity only applies where the State has obtained insurance to cover the risk)).

that George & Lynch and DelDOT did identify how they would mitigate risks to drivers outside of George & Lynch's specified working hours: George & Lynch had to be available to perform any necessary repairs at DelDOT's request. Going beyond the approved traffic control plan and setting up additional anticipatory warning signs for conditions that developed over the weekend was not part of George & Lynch's duty.[63]

By subjecting DelDOT's contractor to liability for additional anticipatory warning signage in a manner that is inconsistent with the contractor's limited role under the contract, we will increase the cost of future bids for state road work because contractors will not be able to rely on the limitations of their contractual duties, but rather, will have to monitor and interpret weather forecasts to determine whether the certainty of a particular forecast is sufficient to justify the cost of discretionary action, in light of, among other considerations, the developing weather condition's possible effect on road conditions and the contractor's desire to

---

[63] The majority interprets *High* as holding that a contractor who follows an approved traffic control plan is not negligent if the precautions specified by the plan are reasonable under the circumstances. But, in finding no negligence on the part of the State Highway Department or its contractor, this Court did not examine whether the design of the traffic control plan was reasonable under the circumstances; rather, it observed that both parties agreed that the plan was prepared in accordance with nationally accepted safety standards. Although the plaintiff's expert opined that "the Highway Department was negligent in following the designated procedures ordinarily and customarily followed for such detours," the Court did not, as the majority suggests, find that the plan was reasonable under the circumstances, other than by reason of its compliance with nationally accepted standards. *High v. State Highway Dep't*, 307 A.2d at 803.

41

minimize exposure to tort suits like this.

In any case where a young life is lost, human heartstrings are naturally pulled, including those of juries, and there is a temptation to award compensation even if no party is at fault, especially if the party being sued is perceived as having large resources. It may be that in certain cases, it can be a jury question whether a party is responsible for not posting a more specific warning sign, but George & Lynch did not undertake a duty to the public of the kind the majority imposes.

Delaware drivers have a duty to give full attention to the operation of their vehicle, with due regard for traffic conditions, maintain a proper lookout, and obey traffic control devices.[64] It has long been recognized that traffic and construction signs are "intended to warn road travelers of particular risks or types of danger,"[65] and a driver who comes across such a warning must take notice of the warning and exercise due care as required by the condition.[66] And DelDOT's construction

---

[64] *See* 21 *Del. C.* § 4176 ("(a) Whoever operates a vehicle in a careless or imprudent manner, or without due regard for road, weather and traffic conditions then existing, shall be guilty of careless driving. (b) Whoever operates a vehicle and who fails to give full time and attention to the operation of the vehicle, or whoever fails to maintain a proper lookout while operating the vehicle, shall be guilty of inattentive driving."); 21 *Del. C.* § 4107(a) ("The driver of any vehicle shall obey the instructions of any traffic-control device applicable thereto placed in accordance with this title . . . .").

[65] 40 Am. Jur. 2d Highways, Streets, and Bridges § 428 Installation and Placement of Warning Devices (2018).

[66] *See generally* 60A C.J.S. Motor Vehicles § 568 n.2 Contributory Negligence (2018) ("Highway under construction: One who operates automobile on a public highway under construction cannot assume that there are no obstructions or dangers ahead and, in such instances, it is the duty of the

contracts require contractors to adhere to uniform specifications based on nationally

accepted standards.[67]    We are reluctant to open up DelDOT and its contractors to

motorist, in the exercise of due care, to keep the vehicle under such control that it can be stopped within the distance within which a proper barrier, obstruction, or obvious danger can be seen."); 40 Am. Jur. 2d Highways, Streets, and Bridges § 594 Proceeding Along Way Which is Closed or under Repair (2018) ("When a highway or street is under construction or repair, to the knowledge of a traveler, he or she may not assume that it is in safe condition.    Because persons and commerce depend on the use of public highways and streets for vehicular traffic, it is not unreasonable for the public authority to permit vehicles to pass over them while they are undergoing repairs such as resurfacing, or when they are torn up for the laying of utility mains, and these instances are of such common occurrence that motorists should expect them to be encountered frequently.    One who operates a motor vehicle on a highway or street which is under construction or repair . . . cannot assume that there are no obstructions, defects, or dangers ahead, but rather, in such instances, it is the duty of the motorist, in the exercise of due care, to keep his or her vehicle under such control that it can be stopped within the distance within which a proper barrier or obstruction, or an obvious danger, can be seen."); *see also, e.g.*, *Woods v. State ex rel. Dep't of Transp. and Dev.*, 852 So.2d 1109, 1122–23 (La. App. 2 Cir. 2003) ("Pursuant to DOTD's detailed instructions, Arnold [the road construction company] had placed numerous barrels, cones, and signs to alert drivers to the construction area.    Any reasonably attentive, albeit careless, driver could have very easily prepared for the difficulties of traversing the construction zone."); *Williams v. State*, 308 N.Y.S.2d 738, 740 (N.Y. App. Div. 1970) ("The construction sign indicating a speed of 25 miles per hour with the admonition 'SLOW', together with the red flashing light which indicated a construction zone should have placed him on notice to proceed with care and caution in accordance with the prevailing circumstances and conditions.").

[67] *Pavik*, 2016 WL 5335792, at *3 (citing *Hales*, 2014 WL 12059005, at *2; *High*, 307 A.2d at 803 ("[T]he traffic-routing plan ultimately approved by the Highway Department was prepared in accordance with usual and normal provisions for the installation of safeguards for the traveling public in accordance with the 'Manual of Uniform Traffic Control Devices', used by the Highway Departments of most, if not all, of the States for this purpose.    There is no doubt, apparently, that the traffic-routing plan actually put into effect on this detour was in accordance with nationally accepted standards.").    According to the majority, the plaintiffs' expert concluded in a supplemental report that the failure to use warning signs breached George & Lynch's contract with the State and the traffic regulations.    App. to Appellee's Answering Br. at 103–04.    The best plaintiffs' expert could muster, however, is the use of signs to alert road users of changing condition would be "consistent" with the contract and regulations—not that it was required and therefore a breach of the contract or regulations.    *Id.*    In any event, whether the plans submitted by George & Lynch complied with the contract and regulations was determined by DelDOT, which approved the plans before construction.    And, as we have explained, George & Lynch's duties during the time it was on site were different than those it had when the road was returned to DelDOT's control over the weekend.    That is, whatever duty George & Lynch might have had

examinations by juries about the precise wording of signs, when the four prominent warning signs that were posted in full compliance with the approved plan—"ROAD WORK 1500 FT," "ROAD WORK 1000 FT," "ROAD WORK 500 FT," and "END ROAD WORK"—should signal to any reasonable driver the need to slow down from the posted 50 miles per hour speed limit and proceed with caution because the road is subject to ongoing construction.[68]  In fact, the driver testified that she would have slowed down had she observed roadwork signs:

> Q. What was it about the signs that caused the accident?
> A. I believe there—if there had been signs, I would have slowed down a lot—lot longer before the accident happened.
> Q. Okay.  Why would you have slowed down?
> A. Because I would have known that there was construction going on.  I would have known to slow down.  I would have known—I would have known to go under the speed limit.
> Q. Okay.  What kind of signs would you need?
> A. Roadwork ahead.
> Q. And what would you have slowed your speed to?
> A. The proper speed that you're supposed to slow down.  If the posted speed is 50, then I would probably slow down to about 40 to see what the road's like; see if it's bad, if it's good.  If it's—if it's bad, I slow down more.[69]

---

under the contract to consider putting up special signs if new conditions arose during the time it was in control of the road is irrelevant to this case.

[68] App. to Appellant's Opening Br. at A317–19 (Preconstruction Meeting Minutes); Appellant's Opening Br. at 3 ("The speed limit was 50 miles per hour, and [Ashlee] may have been [traveling] that speed or just above it.").

[69] App. to Appellant's Opening Br. at A409–10 (Deposition of Ashlee Jean Reed).

But, despite the reality that there were four prominent signs on Omar Road warning of the construction, the driver also testified that she did not see any indications of construction, including road work signs, and did not reduce her speed until she braked when she spotted a deer on the side of the road.[70]

## IV.

Because George & Lynch did not breach its legal duty and had no control over the worksite on the weekend of the accident, we would affirm the grant of summary judgment. The practical reality flowing from the decision of the majority is that road construction contractors are no longer bound only by the approved traffic control plan governing a specific project, but rather, may face potential liability at the discretion of a jury where they could have exercised any level of discretion to take additional precautionary measures. *High* rejects such an expansive scope of liability, and instead limits a contractor's duty in tort to complying with its contractual obligation under its DelDOT-approved plan, finding a basis for liability only where the contractor fails to abide by the traffic control plan designed to ensure public safety.

---

[70] *Id.* at A372, 403–04.